## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RICHARD EKLUND,

     Plaintiff,

v.

RICHARD ROSS, individually;
ROGER CARAMANOFF, individually; and
AUTO KONNECT LLC, a Delaware limited
liability company.

     Defendants.

_____/

Case No. 24-     -CB
Hon.

HERTZ SCHRAM PC
Steve J. Weiss (P32174)
Walter J. Piszczatowski (P27158)
Attorneys for Plaintiff
1760 S. Telegraph Rd., Ste. 300
Bloomfield Hills, MI 48302
(248) 335-5000 / Fax: (248) 335-3346
sweiss@hertzschram.com
wallyp@hertzschram.com

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Richard Eklund ("Eklund"), by and through his attorneys, Hertz Schram PC, submits the following Complaint and Demand for Jury Trial and allegations against Defendants, Richard Ross ("Ross"), individually, Roger Caramanoff ("Caramanoff"), individually, and Auto Konnect LLC, a Delaware limited liability company ("Auto Konnect" or the "Company") (collectively,

"Defendants"):

## RECORDS PRESERVATION NOTICE

You are hereby notified that you remain subject to the continuing duty to preserve during the pendency of this action all records and documents in all forms and formats (digital, electronic, film, magnetic, optical, print, etc.) that are relevant or may lead to relevant information, and to notify your employees, agents and contractors that they are required to take appropriate action to do the same.

## PARTIES, JURISDICTION, AND VENUE

1.      Eklund is a resident of the City of Las Vegas, Clark County, Nevada, and at all relevant times conducted business in Oakland County, Michigan. Eklund is a former Member of Auto Konnect.

2.      Ross is a resident of the City of Naples, Collier County, Florida, and conducts business in Oakland County, Michigan. Upon information and belief, Ross is a current Member of Auto Konnect and, at all relevant times in this Complaint, was a Member of Auto Konnect.

3.      Caramanoff is a resident of the City of Miami Beach, Broward County, Florida, and conducts business in Oakland County, Michigan. Upon information and belief, Caramanoff is a current Member of Auto Konnect and, at all relevant times in this Complaint, was a Member of Auto Konnect.

4857-1500-2055, v. 1

4.      Auto Konnect is a Delaware limited liability company and (i) maintains its Registered Office in the City of Auburn Hills, Oakland County, Michigan and (ii) conducts business in Oakland County, Michigan.

5.      Numerous events giving rise to Plaintiff's claims occurred in Oakland County, Michigan.

6.      The claims in this matter arise out of the relationships between Eklund, Caramanoff, and Ross as Members and/or putative Managers of Auto Konnect and actions taken by Ross and Caramanoff resulting in the involuntary (i) termination of Eklund's employment and (ii) divestment of Eklund's membership interest in Auto Konnect.

7.      The amount in controversy exceeds $75,000, exclusive of costs and interest. 28 U.S.C. § 1332(a)

8.      This action is between citizens of different states. 28 U.S.C. § 1332(a)(1).

9.      Subject matter jurisdiction is proper based upon diversity of citizenship and the amount in controversy.  28 U.S.C. § 1332(a), (c)

10.     Personal jurisdiction over the Defendants is proper under MCL 600.705 because the Defendants (i) transacted business within the Eastern District of Michigan ; (ii) caused an act to be done, or consequences to occur, in the Eastern District of Michigan resulting in an action for tort; (iii) own or owned personal

property situated within the State of Michigan; and/or (iv) acted as a Manager or officer of a company domiciled in the State of Michigan.

11.    Venue is proper under 28 U.S.C. § 1391(b)(2), as Auto Konnect resides in this District and a substantial part of the events giving rise to this action occurred in this District.

## INTRODUCTION

12.    Following the formation of Auto Konnect ("Company") in 2007, Eklund's principal responsibilities included managing, addressing, and coordinating the daily operations and human resource needs of the Company, from the simplest to the most complex activities.

13.    Although Caramanoff and Ross also assumed specific Company responsibilities, governance was invariably treated as a collective effort of the Members and required unanimity on all ownership, management, and employment decisions.

14.    If the Members could not unanimously agree on a proposed action, the status quo remained intact.

15.    This policy and practice continued to govern all Company decisions for more than fifteen (15) years, including, but not limited to, those concerning the Company's business operations and interpretation of the parties' relevant business agreements discussed in this Complaint.

4857-1500-2055, v. 1

16.     In August 2021, Auto Konnect hired Al Birkle ("Birkle") to serve as President of the Company.

17.     On October 21, 2021, Eklund met with Ross and Caramanoff to express his (i) dissatisfaction with Birkle's performance as President of the Company and Birkle's failure to comply with the terms of his employment agreement, and (ii) desire that the Company terminate Birkle's employment.

18.     In the Fall of 2022, the Members initiated efforts to update and amend the Company's original Operating Agreement (the "Original OA"), executed as of January 30, 2008, to, among other things, (i) codify the parties' longstanding policies and practices requiring unanimous consent of the Members for all ownership, management, and employment decisions, and (ii) provide that each Member's heirs and other designated beneficiaries receive the Member's membership interest or full value thereof following the Member's death.

19.     In early November 2022, the Members unanimously decided to retain a law firm in Los Angeles, California "LA Law"), to prepare an amended operating agreement (the "New OA") reflecting their desired provisions.  LA Law previously represented Auto Konnect in litigation against BMW.

20.     In the ensuing weeks, the Members conferred with an attorney from LA Law ("the LA Law Attorney"), and identified terms for inclusion in the New OA, and the LA Law Attorney delivered the initial draft of the New OA (the "Initial Draft

5

OA") to the Members on November 21, 2022.

21.    On January 4, 2023, before the Members and the LA Law Attorney discussed the Initial Draft OA, Ross recommended via email to Caramanoff and Eklund the following: "Since we seem to have trouble completing the review of our new operating agreement, it is my suggestion that we sign the document as is for the following reasons":

(i)      "It is far better than the existing agreement";

(ii)     "Once we sit down with the attorney, we can make modifications and sign the new version"; and

(iii)    "It can be updated at any time.

At least we will have something in place that is substantial."

22.    Rather than sign the Initial Draft OA, the Members participated in a conference call with the LA Law Attorney on January 11, 2023, to review the Initial Draft OA, and then met in person at the LA Law's  office on April 4, 2023, to complete their review.

23.    The LA Law attorney notified the Members via email on April 13, 2023, that he would deliver another draft of the New OA by "early next week."

24.    On May 11, 2023, Ross emailed Caramanoff and Eklund as a "follow-up to our April 4th meeting… to continue our discussion regarding the direction of the company, specifically the owner's involvement…." Ross proposed that the

6

Members meet at LA Law's office on June 7, 2023, but to avoid conflicts, the Members agreed to meet on June 6th.

25.    After several weeks passed without receipt from the LA Law Attorney of the promised new draft or any communication, whatsoever, Eklund emailed the LA Law Attorney on June 2, 2023, at 2:58 p.m. and requested an update, noting that "we are coming next Tuesday" (June 6th), the day Eklund believed the Members intended to finalize and execute the New OA. The LA Law Attorney  emailed the requested draft (the "Revised Draft OA") shortly after his receipt of Eklund's email on that same day.  Following his receipt of the LA Law Attorney's email, Eklund telephoned the Law Attorney to seek clarification on a specific matter during which conversation Eklund and the LA Law Attorney discussed finalization of the Revised Draft OA and confirmed the time of the June 6th meeting.

26.    Eklund arrived at the LA Law office on the scheduled date, excited to finalize and execute the New OA and celebrate this momentous event. But, shortly after Eklund's arrival, in a jarring moment and to Eklund's shock and dismay, Caramanoff and Ross handed Eklund an Action by Written Consent (the "First AWC") signed by them that terminated Eklund's employment at the Company, without cause and effective immediately, thereby triggering the (i) involuntary redemption of his membership interest under the Members' Stock Redemption Agreement ("the SRA"), and the (ii) consequent cessation of distributions to him

7

from the Company. (**Ex**. **A**)

27.     The LA Law Attorney and  the LA Law Founder (the "Founder")  were in the room when Eklund received the First AWC.

28.     In a letter accompanying the First AWC, Caramanoff and Ross stated that the redemption price payable to Eklund under the SRA equaled 40% of the total cash compensation, salary, bonus, draws and dividends Caramanoff and Ross received from the Company during the ensuing three years (collectively, the "Aggregate Cash Amount"). (**Ex**. **B**)

29.     After Eklund objected to his co-Members' unilateral termination of his employment and involuntary redemption of his membership interest, Caramanoff and Ross delivered to Eklund on July 14, 2023 another Action by Written Consent (the  "Second AWC")  and  accompanying  letter,  each  notifying  Eklund  of Caramanoff's and Ross' recharacterization of his prior termination as "for just cause."   (**Ex. C** and **Ex**. **D**)

30.     Caramanoff and Ross relied upon Eklund's breach of Paragraphs 1(b) and 1(d) of his Employment Agreement to establish the requisite "just cause," but neglected to identify the specific acts that constituted the breach. Paragraphs 1(b) and 1(d) of the Employment Agreement define "just cause" as follows:

> 1(b)   an Employee engaging in misconduct or mismanagement of the Company which is materially injurious to the Company and that substantially limits the Employee's ability to discharge his usual and customary duties for the Company; and

1(d)   an Employee's refusal to comply with any decision, policy, directive or decision of the Company.

31.   Despite the devastating consequences arising from the termination of Eklund's employment, neither the Second AWC nor the accompanying letter offers any details substantiating that Eklund's conduct (i) materially injured the Company and substantially limited his ability to discharge his duties, or (ii) demonstrated his refusal to comply with any decision, policy or directive of the Company.

32.   Caramanoff's and Ross' actions constituted an unvarnished and unlawful attempt to line their pockets and strip Eklund of his rights to a one-third interest in (i) the substantial value of the Company, (ii) profits distributed by the Company, and (iii) any future appreciation of value in a successful and profitable Company in which he played a leading role in creating and developing.

33.   Caramanoff's and Ross' wrongful conduct, among other things, (i) breached the parties' longstanding agreement to render decisions unanimously, (ii) breached their fiduciary duties owed to Eklund, (iii) oppressed Eklund, as a minority Member of the Company, and (iv) resulted in a conversion of Eklund's property, all as more fully elucidated below.

### Increasing Value of Auto Konnect

34.   In fiscal years 2020, 2021, and 2022, the net ordinary income of Auto Konnect was $2,977,542, $3,301,595, and $7,070,847, respectively.

35.     Upon information and belief, in fiscal year 2023, the net income of Auto Konnect exceeded $6,000,000.

36.     Upon information and belief, the enterprise value of Auto Konnect is a high multiple of the EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization) of Auto Konnect, rendering Eklund's one-third ownership interest in the Company potentially worth significantly more than $10,000,000.

37.     The increasing net income and enterprise value of Auto Konnect is due, in substantial measure, to Eklund's sales efforts and potential relationship with a large auto manufacturer.  Indeed, prior to the termination of his employment in June 2023, Eklund's efforts engendered expectations of annual sales more than $7,000,000 to such manufacturer, increasing the total sales and net income of the Company by more than twenty-five percent (25%).

## STATEMENT OF FACTS

### *Agreements of the Parties*

#### *Operating Agreement*

38.     Plaintiff and Defendants entered  the Original OA on January 30, 2008. (**Ex. E** at 1), fifteen (15) years before the calamitous events orchestrated by Caramanoff and Ross befell Eklund.

39.     Signatories to the Original OA included the individual Members, Caramanoff, Ross, and Eklund and by Ross on behalf of Auto Konnect. (**Ex. E**, §

10

19)

40.     Each Member contributed to the capital of the Company an amount equal to $16,666.67 and each owns five hundred (500) Class A Units of Auto Konnect. (**Ex. E**, § 2.1; **Ex. E** at 20, Schedule 2.1)  The Company has not issued Units of any other class.

41.     In its prefatory paragraph, the Original OA correctly indicates Auto Konnect is a "Delaware limited liability company," but then erroneously states it was "formed as a limited liability company under and subject to the Michigan Limited Liability Company Act" (the "LLC Act").

42.     It also provides that "the rights and obligations of the Members and the administration and termination of [Auto Konnect] shall be governed by the Act." (**Ex. E**, § 1.1)

43.     Auto Konnect filed an Application for Certificate of Authority to Transact Business in Michigan and, on January 29, 2011, the State of Michigan authorized Auto Konnect to conduct business in Michigan.

44.     Section 3.6(a) of the OA requires that Auto Konnect distribute cash to the Members in proportion to their ownership interests (**Ex. E**, § 3.6(a)) and Section 3.6(b) further requires distribution of cash to each Member not later than March 31st of each year.

45.     Section 4.1(a) of the Original OA, titled "Management of the Company," states that management of the Company shall in all respects be the full and complete responsibility of the <u>Members</u>, who are identified as Ross, Caramanoff, and Eklund. (**Ex. E**, § 4.1(a))

46.     Section 4.1(b) reinforces the delegation of management to the Members: "The Members shall make all decisions in their sole and absolute discretion."

47.     The Original OA confirms that (i) "Manager" and "Member" are not synonymous but that a "person may be a Manager and a Member at the same time," (ii) a Member has and retains various rights "were he or she not also a Manager," and (iii) removal of a Manager is separate from the removal of a Member. (**Ex. E**, § 5.2(e) and § 4.1(c))

48.     The Original OA nowhere appoints any Managers.

49.     Section 5.6 of the Original OA states that, "unless otherwise provided" in the OA or the Articles of Organization, action of the Members is approved if it received approval by "more than fifty (50%) percent of the holders of Units of each Class voting." But, Section 6.1 of the Original OA expressly excepts from the majority voting requirement the transfer of a Member's Units and requires the approval of such transfer by unanimous vote of the Members: "The  Members shall not sell, encumber, transfer, assign, or otherwise dispose of all or any part of their

Units during their lifetimes except with the consent of **the holders of all outstanding Units or as provided for in the parties Stock Redemption Agreement**."[1] (**Ex. E**, § 6.1, emphasis added)

50.     Thus, pursuant to the majority rule exception articulated in Section 6.1 of the Original OA and its reference to the SRA, discussed in detail below, the Original OA expressly requires unanimous consent of the Members for the sale, encumbrance, transfer, assignment, or other disposition of Eklund's membership interest.

51.     Although the Original OA is silent on the termination of a Member's employment without his consent, it expressly requires the unanimous consent of all Members to alter a Member's membership interest, the precise outcome sought by Caramanoff and Ross when they both triggered the redemption of Eklund's membership interest by terminating his employment, and at a price at least $10,000,000 less than fair market value, knowingly leaving themselves as the sole beneficiaries of this windfall.

52.     Article IX of the Original OA limits the scope of amendments to the Original OA. (**Ex. E**, ¶¶ 9.1-9.2) Notably, the Original OA provides that it "shall not be amended without the consent of **each Member** adversely affected if such

---

[1] Although Section 6.2 of the Original OA refers to a Stock Redemption Agreement of January 30, 2008, that agreement was superseded by another Stock Redemption Agreement signed on January 30, 2015 ("SRA"), and addressed *infra*. (**Ex. E**, § 6.2; SRA at ¶ 1, **Ex. G**)

amendment would alter the interest of a Member in profits, losses, Company distribution or voting rights." (**Ex. E**, § 9.2, emphasis added)

53.    Construed together with § 6.1 of the Original OA and the provisions of the SRA, § 9.2 of the Original OA represents another express agreement of the Members that a Member's membership interest in Auto Konnect and such Member's fringe benefits cannot be altered or adversely affected without unanimous consent or consent of the Member adversely affected.

54.    Section 10.8 of the Original OA states that "in the event of a conflict or inconsistency" between the Original OA and the SRA, the SRA will control and apply. (**Ex. E**, § 10.8)

55.    After the execution of the Original OA, Caramanoff, Ross, and Eklund consistently applied various Company policies and practices and the provisions of the Original OA and the SRA, establishing that the Members would only act to alter a Member's employment, management participation, or membership interest by unanimous consent of the Members.

56.    Caramanoff and Ross breached the unanimous consent requirements of the Original OA and SRA, and the parties' longstanding policies and practices, by terminating Eklund's employment and leveraging that outcome to (i) divest Eklund of his membership interest and management participation, (ii) eliminate his entitlement to distributions, and (iii) disenfranchise his voting rights, all such actions

14

designed to capture the substantial fair market value of Eklund's one-third ownership interest in the Company, thereby enriching themselves at Eklund's expense.

57.     Stated otherwise, Caramanoff's and Ross' refusal to adhere to the unanimous consent requirement regarding Member distributions, Member employment, and the transfer or disposition of a Member's membership interest constitutes (i) an act of oppression against Eklund, a minority owner; (ii) a breach of their fiduciary duties; and (iii) a breach of the Original OA and SRA as well as the Company's longstanding policies and practices requiring such unanimous consent. Indeed, even absent any unanimous consent requirement, Caramanoff's and Ross' egregious misconduct and woeful failure to meet the high  standards of the fiduciary duties of fairness, honesty, good faith, and loyalty owed to their minority co-Member engender claims of breach of their fiduciary duties owed to, and oppression against, Eklund.

58.     Eklund objected to Caramanoff's and Ross' termination of his employment and the other actions adversely affecting his employment, ownership, voting rights, and other interests and rights in the Company as outside the scope of authority granted to the Members pursuant to the Original OA or otherwise. (**Ex. E**, § 4.2)

*Stock Redemption Agreement*

59.    As an initial matter, the current SRA, executed on January 30, 2015, states that the SRA, the Original OA, and the parties' Employment Agreement "constitute the entire agreement of the parties and supersede and forever terminate all **prior**" promises, agreements, and negotiations regarding the SRA subject matter. (**Ex. G**, ¶ 12, emphasis added)

60.    The SRA also reaffirms that the parties intended their relationships to "be governed by and interpreted in accordance with the laws of the State of Michigan" and that any lawsuit related to the SRA would be brought in the Michigan State or Federal courts. (**Ex. G**, ¶ 13)

61.    As concerns a transfer to third parties, the SRA prohibits a Member's sale or transfer of his membership interest in the Company "**without the expressed written consent of all" the Members** of the Company. (**Ex. G**, ¶ 9, emphasis added.)

62.    Section 9 of the SRA also provides that any effort to sell or transfer a Member's membership interest in the Company "shall, without the expressed written consent of all" the Members of the company, not be recognized by the Company, and "it shall have no legal effect and shall be null and void." (**Ex. G**, ¶ 9)

63.    Section 9's unanimity provisions represent the sole provisions in the SRA establishing a threshold voting requirement to transfer membership interests.

16

Although this voting requirement may not apply to those triggering events in the SRA that are self-executing, such as death, disability, or a Member's voluntary termination, it necessarily governs those triggering events requiring actions by the Members. (**Ex. G**, ¶ 9)

64.     Sections 9 and 6.1 of the SRA and Original OA, respectively, prohibit any sale or transfer of a Member's membership interest without consent of all the Members and are consistent with the provisions of the OA prohibiting any amendments to the Original OA "without the consent of each Member adversely affected" by the amendment. (**Ex. G**, ¶ 9; **Ex. E**, § 6.1 and § 9.2)

65.     As concerns  the termination of employment, the SRA provides that, if the owner's "employment with the Company is terminated ***without cause***," then "the owner shall be required to sell" and the Company shall be required to "purchase the terminated owner's stock" [sic] at a price equal to 40% of the total compensation (salary, bonus, draws and dividends)  paid to the remaining owners for a period of three years after the termination date." (**Ex. G**, ¶ 1)

66.     Significantly, the SRA neither states nor contemplates that a Member's employment with the Company may be terminated "without cause" with less than the unanimous consent of all the Members (**Ex. G**, ¶ 1), and such consent is otherwise required by the Original OA, the SRA, and the parties' longstanding policies and practices.

67.     According to the SRA, if the Company terminates an owner's employment for "*just cause*," then "the Owner shall be required to sell" and the Company shall be required to "purchase the terminated Owner's stock" at a price equal to 15% of the Aggregate Cash Amount paid to the owners during the three-year period following the termination. (**Ex. G**, ¶ 5)

68.     Nothing in the SRA even intimates that a Member's employment with the Company may be terminated "for just cause" with less than unanimous consent of the Members (**Ex. G**, ¶ 5), and such consent is otherwise required by the Original OA, the SRA, and the parties' longstanding policies and practices.

69.     Section 1 of Eklund's Employment Agreement (the "EA")with the Company defines "just cause" as:

> "(a) an Employee's conviction of a felony which requires incarceration and substantially limits an Employee's ability to perform his usual and customary duties for the Company; (b) an Employee engaging in misconduct or mismanagement of the Company which is materially injurious to the Company and that substantially limits the Employee's ability to discharge his usual and customary duties for the Company; (c) the Employee's alcohol, drug or substance abuse that substantially limits the Employee's ability to discharge his usual and customary duties for the Company; (d) an Employee's refusal to comply with any decision, policy, directive or decision of the Company; (e) an Employee's misappropriation of Company assets and/or a Company business opportunity for the direct or indirect benefit of the Employee; (f) any violation of the non-competition, no-solicitation and/or non-disclosure provisions contained in this Agreement.
>
> (**Ex. F**, ¶ 1)

70.    None of the listed reasons for "just cause" termination applied to Eklund.

71.    Eklund did not consent to his termination, either without cause or for just cause, or to the sale or transfer of his membership interest.

72.    Caramanoff and Ross breached the unanimous consent requirements of the SRA, the Original OA, and the parties' longstanding policies and practices when they unilaterally and otherwise improperly terminated Eklund's employment with the Company and thereby unlawfully divested him of his membership interest in the Company and all benefits derived therefrom in order to line their pockets.

73.    As mandated by Section 9 of the SRA, Caramanoff's and Ross' joint effort to compel Eklund, through their unilateral and otherwise unlawful termination of his employment, to sell or transfer his membership interest in the Company without his consent had "no legal effect" and was "null and void." (**Ex. G**, ¶¶ 1, 5, 9)

74.    As provided in the SRA, the prevailing party in any "litigated dispute over the terms, enforcement and/or interpretation" of the SRA "shall be entitled to an award of reasonable attorney fees, costs, and professional fees" incurred to "enforce, defend, and/or interpret" the SRA. (**Ex. G**, ¶ 11)  Accordingly, Eklund is also entitled to such an award of fees here.

19

*Eklund Employment Agreement*

75.    Although the EA contemplates the termination of a Member's employment for cause by the Company, the EA offers no insights into the underlying process governing termination. However, because the termination implicates the potential "<u>transfer</u>" of a Member's membership interest under the SRA, the termination necessarily requires the unanimous consent of the Members.  (**Ex. F**, ¶ 1; **Ex. G**, ¶¶ 1, 9; **Ex. E**, § 6.1, 9.2)

76.    Stated differently, under the EA, a Member's "employment can be terminated" "by the Company" "for cause," but the EA does not expressly permit the Company to terminate a Member or eliminate a Member's benefits without the consent of all Members. It remains irrefutable that termination of a Member's employment "alters" a Member's membership interest as such termination triggers the transfer of the Member's membership interest to the Company under the SRA, and the Original OA and SRA expressly require unanimous consent of all Members to alter a Member's membership interest.

77.    Moreover, a Member's employment duties and assignments "are directed by the Company," and such control over Member-employee duties has always, as a matter of longstanding policy and practice, required the unanimous decision of the Members, including the consent of the affected Member. (**Ex. F**, ¶ 6)

78.     Here, without Eklund's consent, Caramanoff and Ross wrongfully sought to terminate Eklund's employment with the Company, first without cause and then purportedly for "just cause."  Again, none of the listed reasons for "just cause" termination applied to Eklund. (**Ex. F**, ¶ 1)  In addition to the absurdity of their belated attempt to terminate "for cause" an employee whom they had already terminated without cause, Caramanoff's and Ross' second bite of the proverbial apple lays bare and renders more transparent their improvident attempt to reduce the redemption price by sixty-three percent (63%) (from 40% to 15%; (40 - .15) ÷ 40) to further enrich themselves, just another instance of their oppression of Eklund's rights, among other wrongful conduct.

79.     Caramanoff's and Ross' refusal to follow the unanimous consent requirements of the SRA, the Original OA, and the parties' longstanding policies and practices regarding Member employment and termination thereof constitutes an act of oppression against Eklund, a minority Member; a breach of their fiduciary duties; and a breach of the OA and SRA as well as the Company's longstanding policies and practices requiring such unanimous consent.  Caramanoff's and Ross' purported termination of Eklund's employment with the Company, whether "for cause" or otherwise, also constitutes a breach of the EA itself.

80.     Like the SRA, the EA enables the prevailing party in any "litigated dispute  concerning  the terms of the EA to recover reasonable attorney fees, costs,

21

and professional fees incurred to enforce, defend, and/or interpret the EA, and confirms the Members' intention that their relationships be governed by and interpreted in accordance with the laws of the State of Michigan and any lawsuit related to the EA be brought in the Michigan State or Federal courts. (**Ex. F**, ¶ 14)

### *Consistently Applied Company Policies and Practices*

81.　　As summarized in the preceding paragraphs, none of the Original OA, SRA, or EA expressly permits the Company to, without the consent of all Members, terminate a Member's employment, divest a Member of his membership interest (except in the event of his death, disability, or voluntary termination of employment) or eliminate a Member's benefits, and the OA and SRA expressly require unanimous consent of all Members to alter a Member's membership interest.

82.　　Written documents possessed by the Members and the Company evidence the Members' application of the unanimous consent requirement not only to major operational decisions, but to matters of a general nature and of varying degrees of importance, including, but not limited to, the following:

(a)　　timing and amount of distributions to the Members;

(b)　　procurement of financing and timing and remittance of service payments;

(c)　　retention of legal counsel;

(d)　　litigation strategies and actions;

(e)     initiation and duration of various programs or initiatives of the Company;

(f)     hiring and termination of employees irrespective of the position they occupied;

(g)     compensation and severance payments payable to all employees or departing employees;

(h)     the assignment of duties among the Members and to employees of the Company, including in the context of changing and implementing existing and new Company programs and initiatives;

(i)     identification and pursuit of potential customers;

(j)     formulation, implementation and execution of manufacturing objectives of the Company;

(k)     selection of the Members and other employees (if any) who should participate in industry events related to the Company;

(l)     establishment of the terms and conditions of customer and supplier agreements and requirements;

(m)    marketing initiatives and customer relations events;

(n)     acquisition or disposition of equipment and facilities;

(o)     creation of sales plans;

(p)     determination of appropriate inventory levels;

(q)     approval of research and development expenditures to achieve operational efficiencies and other strategic objectives; and

(r)     budgeting, financial, and tax matters.

83.     In the event the Members did not unanimously consent to an action, such as terminating an employee, the status quo remained, and the employee would not be terminated.

### Termination of Eklund's Employment

84.     As discussed above, on June 6, 2023, at LA Law's office and in the presence of the La Law Attorney and the LA Law Founder, Caramanoff and Ross handed Eklund the First AWC, which (i) terminated Eklund's employment at the Company without cause and (ii) triggered the divestment of his membership interest under the SRA by causing the involuntary transfer of his membership interest to the Company and the consequent cessation of distributions to him from the Company. (**Ex. A**)

85.     At that same time, Caramanoff and Ross also delivered to Eklund, on Company letterhead, a letter referring to the First AWC that, without the requisite unanimous written consent, (i) demanded that Eklund sell his membership interest, (ii) withdrew  Eklund's authority to act on behalf of Auto Konnect, (iii) stated Eklund's personal property would be removed from the Company's premises,

24

effectively locking him out of the business, and (iv) required that Eklund relinquish all his materials, tools, computers, credit cards, and other materials related to Auto Konnect. (**Ex. B**)

86.     Notably, after Eklund's termination and return of Auto Konnect credit cards, Caramanoff and Ross continued to pour salt on Eklund's wound by using Eklund's credit card to pay more than Fifty Thousand Dollars ($50,000) of Company expenses, a debt that Eklund ultimately personally paid.

87.     On or about June 30, 2023, Eklund, through counsel, objected to all the foregoing improper actions, maintaining that all such actions fell outside the scope of Caramanoff's and Ross' authority.

88.     Caramanoff's and Ross' counsel acknowledged receipt of Eklund's objections on July 6, 2023, but eight (8) days later Caramanoff and Ross sent to Eklund the Second AWC. As previously discussed, despite having already terminated Eklund's employment on June 6, 2023, without cause, Caramanoff and Ross thought it necessary to again terminate Eklund for the sole purpose of recharacterizing their prior action as a termination "for just cause" based on the undefined misconduct and Eklund's refusal to comply with Caramanoff's and Ross' directives. (**Ex. C**)

89.     Contemporaneously with the delivery to Eklund of the Second AWC, Caramanoff and Ross also sent to Eklund, on Company letterhead, a letter referring

to such Second AWC and describing the modified termination "for just cause" and, not surprisingly, informing Eklund that the purchase price under the SRA for his membership interest would be reduced from a payment of forty percent (40%) to fifteen percent (15%) of the Aggregate Cash Amount received by Caramanoff and Ross during the ensuing three (3 ) years. (**Ex. D**)

90.     On or about July 28, 2023, Eklund, through counsel, renewed his objection that Caramanoff's and Ross' actions were outside the scope of their authority and otherwise improper.

91.     Between the June 6th termination "without cause" and the July 14th modified termination "for just cause," Eklund had not engaged in any substantive activities on behalf of or relating to the Company, other than objecting to Caramanoff's and Ross' efforts to oppress him, breach their fiduciary duties, and breach their agreements and longstanding policies and practices as to Eklund's rights and privileges as a Member of the Company.

92.     Caramanoff's and Ross' blatant attempt to manipulate the redemption price payable to Eklund to line their pockets is further evidence of, among other wrongful conduct, their: (i) oppression of Eklund, as a minority Member; (ii) breaches of fiduciary duties owing to him; and (iii) breaches of the Original OA, SRA, and EA as well as the Company's longstanding policies and practices.

### *Other Proposed Amended Agreements*

93.     Actions by the Members months before Auto Konnect's retention of LA Law, and shortly thereafter, illustrate the Members' fervent desire to modify the Original OA and the SRA.

94.     On March 22, 2022, Ross emailed  Caramanoff and Eklund a revised draft of the 2015 Stock Redemption Agreement then in effect (the "Revised Draft SRA"). Consistent with the Members' yearning at such time to modify their outdated governing documents and the Company's improving performance and prospects, the Revised Draft SRA materially altered the methodology used to determine the purchase price upon a redemption of a Member's membership interest arising from the occurrence of triggering events. For example, the purchase price for the membership interest redeemed in connection with the termination of a Member's employment "for just cause" equals the total cash value of such membership interest as determined by a valuation Company and is payable quarterly in an amount equal to one-third of the Company's net profits until fully paid.   That valuation methodology applies to each of the triggering events listed in the Revised Draft SRA. Ross ultimately provided the Revised Draft SRA to LA Law on October 31, 2022, noting in his cover email that the Members "currently have what we consider to be a weak agreement and have come up with the attached new partnership agreement" (i.e., the Revised Draft SRA)…. We would like to get this complete[d] as soon as

possible."

95.     Moreover, on January 11, 2023, the same day the Members and the LA Law Attorney  together reviewed the Revised Draft OA, Caramanoff emailed to Ross and Eklund a draft of an operating agreement he found on the Internet (the "Internet Draft OA") that, like the Revised Draft SRA, required payment to the Member subject to a redemption triggering event of an amount equal to the fair market value of the Member's membership interest, as determined by "an outside firm."  Not surprisingly, the LA Law Attorney's Revised Draft OA, delivered to Eklund on June 2, 2023, used the same methodology to determine the purchase price payable to a Member upon redemption of the Member's membership interest following a triggering event.

### *Amending the Operating Agreement*

96.     After retaining LA Law to assist in formulating and drafting the New OA in early November 2022,  Caramanoff, Ross, and Eklund requested that the agreement (i) clearly provide that the heirs of each Member receive the membership interest or full value of the Member's interest upon his death; (ii) codify the longstanding policies and practices of the Members, including the unanimous consent requirements; and (iii) memorialize other modifications of the original OA, including without limitation, redemption of a Member's membership interest at a purchase price equal to the fair market value of such membership interest and the

4857-1500-2055, v. 1

appointment of Managers.

97.    On November 21, 2022, LA Law Attorney delivered to the Members his first draft of the New OA, the Initial Draft OA.

98.    At the in-person meeting in LA Law's  office on April 4, 2022, prior to discussion of the Initial Draft OA, Ross broached the issue of Eklund's concerns about Birkle's job performance. After the Members addressed such concerns for approximately forty-five (45) minutes, Eklund expressed his willingness to continue Birkles employment and move forward with Birkle in a constructive manner.

99.    The LA Law Attorney notified the Members on April 13, 2023, that he would deliver the Revised Draft OA by "early next week."

100.    Several weeks after the April 4th meeting, the Members agreed to meet at the LA Law office on June 6, 2023, to discuss the LA Law Attorney's Revised Draft OA and Auto Konnect's business operations.

101.    After receiving the LA Law Attorney's  Revised Draft OA on June 2, 2023, Eklund expected the final draft of the New OA to include the following terms:

       (a)    Unanimity requirements as to:

              i.    admission of new Members;

              ii.    transfer of a Member's membership interest;

              iii.    sale of substantially all  the assets of the Company;

              iv.    merger or consolidation with another Company;

v.    management of the Company by Managers;

vi.    appointment of a new Manager to fill a vacancy;

vii.    the Company's entry of an agreement with a Member or Manager, or commingling Company funds with the funds of an unrelated person or entity;

viii.    dissolution of the Company;

ix.    pledge of a Member's membership interest as collateral or encumbrance of the membership interest;

(b)    expulsion of a Member from the Company for "cause" subject to a final, unappealable adjudication that cause exists;

(c)    payment of fair market value for the redemption of a membership interest of a Member upon the occurrence of certain triggering events.

102.    Instead of finalizing the Revised Draft OA for execution at the meeting on June 6, 2023, Caramanoff and Ross ambushed Eklund with the Action by Written Consent terminating his employment, their contemporaneous actions and statements then revealing they had been coordinating a clandestine scheme for an extended period to acquire Eklund's membership interest and associated rights for substantially less than fair market value.

30

103.   Upon information and belief, Caramanoff and Ross coordinated these actions with the LA Law while concealing from Eklund this scheme and their related communications with LA Law as well, despite and in breach of the fiduciary duties owed by them to Eklund.

**COUNT I:**
**BREACH OF CONTRACT**
**(as to all Defendants)**

104.   Plaintiff re-alleges and incorporates by reference all the previous and subsequent assertions as though fully set forth herein.

105.   The parties were competent to enter a contract and created a valid and binding contract, supported by mutual consideration, and as set forth in the OA, SRA, EA, and/or the policies and practices.

106.   As outlined previously in this Complaint and set forth in the attached documents, the parties agreed, among other things, that Eklund would be a Member, manager, and employee of the Company and that he could not be deprived of the benefits of ownership or employment without the unanimous decision of the Members, and the parties' policies and practices during the past fifteen (15) years only serve to confirm the Members' adoption and acceptance of this intent and interpretation of the documents.

107.   At the time of execution of the agreement(s), Ross and Caramanoff were   aware   of   the   purposes   of   the   agreement(s)   to,   among   other   things,

31

unconditionally provide Eklund with interests as a Member, manager, and employee of the Company and the benefits derived therefrom, including distributions of the Company's profits and participation in the operation of the business.

108.   Ross and Caramanoff breached the agreement(s) and their obligations thereunder in multiple ways, including, but not limited to, the following:

> (a)   eliminating Eklund's as a Member and/or manager without his consent;
>
> (b)   terminating Eklund's employment without his consent;
>
> (c)   divesting Eklund of his membership interest and the benefits derived therefrom without his consent; and
>
> (d)   violating and breaching the parties' longstanding agreements, policies, and practices requiring unanimity before implementing any action that might adversely affect an owner's management, employment, and/or membership interest and benefits, including distributions.

109.   As a direct and proximate result of the Defendants' breaches, Eklund has suffered damages in an amount in excess of seventy-five thousand dollars ($75,000).

Wherefore, Plaintiff seeks entry of a judgment in his favor and against all Defendants, jointly and severally, awarding the following relief:

(a)     a 33.3333% membership interest in the Company encompassing all the management, economic, voting, and other rights enjoyed by Ross and Caramanoff;

(b)     an amount equal to the distributions, compensation, and other payments received by each of Ross and Caramanoff from the Company on and after June 5, 2023;

(c)     the same Company fringe benefits to which Plaintiff was entitled as of June 5, 2023;

(d)     reinstatement of Plaintiff's employment;

(e)     appointment of Plaintiff as a Manager of the Company;

(f)     all damages sustained by Plaintiff arising from Defendants' breaches of contract;

(g)      interest, attorneys' fees and costs incurred by Plaintiff in the prosecution of this claim; and

(h)     any other relief this court deems appropriate.

<u>**COUNT II:**</u>
**BREACH OF FIDUCIARY DUTIES**
**(as to Ross and Caramanoff)**

110.   Plaintiff re-alleges and incorporates by reference all the previous and subsequent assertions as though fully set forth herein.

4857-1500-2055, v. 1

111. At all relevant times, Ross and Caramanoff, as Members (individually and as a control group), officers, and/or managers, owed fiduciary duties to act for the benefit of Eklund, a minority Member.

112. Such fiduciary duties existed because (i) Eklund reposed his faith, confidence, and trust in Ross and Caramanoff and relied upon their judgment and advice, including, among other things, when the three Members assumed individual duties within the Company and relied upon one another for good faith dealings as to the others' duties and as to full disclosures by the others and also because they exercised unanimous control of the Company separately from Eklund in various instances and communicated with the Company's counsel separately from Eklund; (ii) Ross and Caramanoff gained influence over Eklund, including exercising unanimous control of the Company separately from Eklund in various instances and communicating with the Company's counsel separately from Eklund.

113. Ross and Caramanoff, in the context and circumstances at issue, and pursuant to controlling law, owed the following fiduciary duties to Eklund:

    (a)    To act with due care;

    (b)    To act with loyalty;

    (c)    To act in good faith;

    (d)    To disclose all material facts within their knowledge that may influence control of the Company;

(e) To act honestly;

(f) To exercise the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(g) To act in a manner they reasonably believe to be in the best interests of the Members' joint enterprises.

114. Ross and Caramanoff, in the context and circumstances at issue, and pursuant to controlling law, also owed fiduciary duties to Eklund to refrain from acting in certain ways, including:

(a) Engaging in self-interested or self-dealing conduct, especially to Eklund's detriment;

(b) Dealing dishonestly and/or in bad faith with Eklund; and

(c) Engaging in willfully unfair and oppressive conduct.

115.  Ross and Caramanoff acted in breach of their fiduciary duties to Eklund, including by acting dishonestly, disloyally, in bad faith, and out of self-interest, when they committed the following acts, among others:

(a) eliminated Eklund's participation in the management and governance of the Company;

(b) terminated Eklund's employment with the Company;

(c) divested Eklund of his membership interest in the Company and the benefits derived therefrom, including distributions;

(d)     violated the parties' longstanding agreements, policies, and practices requiring unanimous decisions to adversely affect a Member's management, employment, and/or membership interests and benefits, including distributions;

(e)     purported to work with legal counsel for the Company to protect the Members' interests through a clarifying operating agreement while surreptitiously working with said counsel and otherwise coordinating actions to terminate Eklund's employment and eliminate his membership interest;

(f)     further reduced Eklund's access to Company distributions following Eklund's objection to Ross' and Caramanoff's misconduct; and

(g)     otherwise abused their positions of influence over Eklund and betrayed the confidence reposed in them by Eklund.

116.    Through such conduct, Ross and Caramanoff breached their fiduciary duties owed to Eklund.

117.    As a direct and proximate result of their breaches of fiduciary duties, Eklund has suffered and continues to suffer damages in an amount in excess of seventy-five thousand dollars ($75,000).

118.   Ross' and Caramanoff's breaches of their fiduciary duties owed to Eklund were wanton, intentional, and malicious.

Wherefore, Plaintiff seeks entry of a judgment in his favor and against Defendants Ross and Caramanoff, jointly and severally, awarding the following relief:

(a)    a 33.3333% membership interest in the Company encompassing all the management, economic, voting, and other rights enjoyed by Ross and Caramanoff;

(b)    an amount equal to the aggregate of the distributions, compensation, and other payments received by Ross and Caramanoff from the Company on and after June 5, 2023;

(c)    the same Company fringe benefits to which Plaintiff was entitled as of June 5, 2023;

(d)    reinstatement of Plaintiff's employment;

(e)    appointment of Plaintiff as Manager of the Company;

(f)    payment of an amount equal to the fair market value of Plaintiff's membership interest as of the date of entry of the judgment awarding such relief, less any redemption payments received by Plaintiff prior to such judgment;

(g)    all damages sustained by Plaintiff arising from Ross' and Caramanoff's breaches of fiduciary duties owed to Plaintiff;

(h)    interest, attorneys' fees and costs incurred by Plaintiff in the prosecution of this claim; and

(i)    any other relief this Court deems appropriate.

**COUNT III:**
**VIOLATION OF MCL 450.4515**
**OPPRESSION OF MINORITY MEMBER**
**(as to Ross and Caramanoff)**

119.    Plaintiff re-alleges and incorporates by reference all the previous and subsequent assertions as though fully set forth herein.

120.    Ross' and Caramanoff's control arises out of, among other things and as applicable, their (i) ownership, in the aggregate, of a majority interest of the outstanding membership interests in the Company; (ii) positions as managers and, together, representing a majority of the managers; (iii) positions as officers of the Company; and (iv) coordinated efforts to oppress Eklund, as a minority Member, by improperly excluding Eklund from the business operations of the Company, employment by the Company, and equity ownership in the Company.

121.    Ross and Caramanoff, through the exercise of such control, have violated MCL 450.4515 by engaging in unlawful, fraudulent, and/or willfully unfair and oppressive conduct toward Eklund, as a minority Member, with such conduct including, but not being limited to, the following continuing course of conduct or

38

significant action or series of actions that substantially interfered with Eklund's interests as a Member:

(a) eliminating Eklund's governance rights;

(b) terminating Eklund's employment;

(c) divesting Eklund of his membership interest and the benefits derived therefrom, including distributions;

(d) violating and breaching the parties' longstanding agreements, policies, and practices requiring unanimous decisions that adversely affect a Member's management, employment, and/or membership interest and benefits, including distributions;

(e) purporting to work with legal counsel for the Company to protect the Members' interests through the New OA while surreptitiously working with said counsel and otherwise coordinating actions to eliminate all the foregoing rights of Eklund; and

(f) recharacterizing the termination of Eklund's employment from "without cause" to, thirty (30) days later, "for cause" for the sole purpose of reducing the redemption price for Eklund's membership interest and enriching themselves.

122. Ross' and Caramanoff's acts and conduct were intended to and did, in fact, substantially interfere with Eklund's interests as a Member of the Company;

are unlawful, fraudulent, and/or willfully unfair and oppressive to Eklund's interests in the Company; and have proximately caused substantial damages to Eklund in an amount in excess of seventy-five thousand dollars ($75,000).

Wherefore, Plaintiff seeks entry of a judgment in his favor and against Defendants Ross and Caramanoff, jointly and severally, awarding the following relief:

(a)     a 33.3333% membership interest in the Company encompassing all the management, economic, voting, and other rights enjoyed by Ross and Caramanoff;

(b)     an amount equal to the aggregate of the distributions, compensation, and other payments received by Ross and Caramanoff from the Company on and after June 5, 2023;

(c)     the same Company fringe benefits to which Plaintiff was entitled as of June 5, 2023;

(d)     reinstatement of Plaintiff's employment;

(e)     appointment of Plaintiff as a Manager of the Company;

(f)     payment of an amount equal to the fair market value of Plaintiff's membership interest as of the date of entry of the judgment awarding such relief, less any redemption payments received by Plaintiff prior to such judgment;

(g)    all damages sustained by Plaintiff arising from Ross' and Caramanoff's oppressive conduct;

(h)     interest, attorneys' fees and costs incurred by Plaintiff in the prosecution of this claim; and

(i)    any other relief this Court deems appropriate.

**COUNT IV:**
**COMMON LAW CONVERSION**
**(as to Ross and Caramanoff)**

123.    Plaintiff re-alleges and incorporates by reference all the previous and subsequent assertions as though fully set forth herein.

124.    Eklund had a valid and recognizable personal property interest in his membership interest in the Company and/or in distributions from the Company.

125.    At all times material to the claims at issue, Ross and Caramanoff knew of Eklund's personal property interest in his membership interest in and/or distributions from the Company.

126.    As described throughout this Complaint, Ross and Caramanoff have engaged in one or more acts of dominion wrongfully exerted over Eklund's personal property, his membership interest in and/or distributions from the Company.

127.    Ross' and Caramanoff's conduct constitutes a conversion under Michigan common law.

4857-1500-2055, v. 1

128.   Ross' and Caramanoff's wrongful acts and conduct have proximately caused substantial damages to Eklund in an amount in excess of seventy-five thousand dollars ($75,000).

Wherefore, Plaintiff seeks entry of a judgment in his favor and against Defendants Ross and Caramanoff, jointly and severally, awarding the following relief:

(a)    a 33.3333% membership interest in the Company encompassing all the management, economic, voting, and other rights enjoyed by Ross and Caramanoff;

(b)    an amount equal to the aggregate of the distributions, compensation, and other payments received by Ross and Caramanoff from the Company on and after June 6, 2023;

(c)    the same Company fringe benefits to which Plaintiff was entitled as of June 5, 2023;

(d)    all damages sustained by Plaintiff arising from Ross' and Caramanoff's conversion of Plaintiff's property;

(e)     interest, attorneys' fees and costs incurred by Plaintiff in the prosecution of this claim; and

(f)    any other relief this court deems appropriate.

4857-1500-2055, v. 1

### COUNT V:
### VIOLATION OF MCL 600.2919a
### STATUTORY CONVERSION
### (as to Ross and Caramanoff)

129.   Plaintiff re-alleges and incorporates by reference all the previous and subsequent assertions as though fully set forth herein.

130.   Ross and Caramanoff converted Eklund's property to their own use, in violation of MCL 600.2919a(1)(a), for purposes of, among other things, (i) receiving distributions from the Company that would otherwise be received by Eklund and (ii) increasing their membership interest in the Company and deriving the benefit of any appreciation in the value of such converted membership interest here.

131.   Alternatively, Ross and Caramanoff received or possessed Eklund's property with the knowledge it was converted property, in violation of MCL 600.2919a(1)(b).

132.   Ross' and Caramanoff's actions constitute a denial of, and/or are inconsistent with, Eklund's rights to his membership interest in and/or his distributions from the Company.

133.   Ross' and Caramanoff's conduct constitutes a conversion under Michigan statutory law, entitling Eklund to treble damages and payment of his costs and reasonable attorney fees. MCL 600.2919a(1).

134.   Ross' and Caramanoff's wrongful acts and conduct have proximately caused significant damages to Eklund in an amount in excess of seventy-five thousand dollars ($75,000).

Wherefore, Plaintiff seeks entry of a judgment in his favor and against Defendants Ross and Caramanoff, jointly and severally, awarding the following relief:

(a)   33.3333% membership interest in the Company encompassing all the management, economic, voting, and other rights enjoyed by Ross and Caramanoff;

(b)   an amount equal to the aggregate of the distributions, compensation, and other payments received by Ross and Caramanoff from the Company on and after June 6, 2023;

(c)   the same Company fringe benefits to which Plaintiff was entitled as of June 5, 2023;

(d)   all other damages sustained by Plaintiff arising from Ross' and Caramanoff's conversion of Plaintiff's property;

(e)    interest, attorneys' fees and costs incurred by Plaintiff in the prosecution of this claim, as well as treble damages; and

(f)   any other relief this Court deems appropriate.

4857-1500-2055, v. 1

## COUNT VI:
## UNJUST ENRICHMENT
### (as to all Defendants)

135.   Plaintiff re-alleges and incorporates by reference all the previous and subsequent assertions as though fully set forth herein.

136.   As described throughout this Complaint, Defendants have received considerable benefits from their unlawful conduct, which includes depriving Eklund of his membership interest, management position, employment, and distributions and charging more than fifty thousand dollars ($50,000) on a credit card in Plaintiff's name after he was terminated.

137.   Ross and Caramanoff have benefitted by retaining the equity value of Eklund's membership interest and retaining the value of distributions owed to Eklund, and all Defendants have benefitted from charging more than fifty thousand dollars ($50,000) on Plaintiff's credit card and failing to reimburse Plaintiff for any portion of such charges.

138.   Permitting Defendants to retain such benefits would create a substantial hardship for and inequity to Plaintiff.

139.   To the extent that Defendants' and Plaintiff's relationships and conduct may not be deemed covered by an express contract, the circumstances require that a contract be implied to prevent Defendants' unjust enrichment at Plaintiff's expense.

4857-1500-2055, v. 1

140.   In the interest of serving justice, the Court should award Plaintiff damages in an amount equal to that by which Defendants have been unjustly enriched even if there was no meeting of the minds or contract intended relative to the conduct and injuries addressed.

141.   Defendants' wrongful acts and conduct have proximately caused substantial damages to Eklund in an amount in excess of seventy-five thousand dollars ($75,000).

Wherefore, Plaintiff seeks entry of a judgment in his favor and against all Defendants, jointly and severally, awarding the following relief:

(a)   33.3333% membership interest in the Company encompassing all the management, economic, voting, and other rights enjoyed by Ross and Caramanoff;

(b)   an amount equal to the aggregate of the distributions, compensation, and other payments received by Ross and Caramanoff from the Company on and after June 6, 2023;

(c)   the same Company fringe benefits to which Plaintiff was entitled as of June 5, 2023;

(d)   all other damages sustained by Plaintiff arising from Ross' and Caramanoff's wrongful retention or use of Plaintiff's property and resultant unjust enrichment, including, without limitation, the charges

46

placed on Plaintiff's credit card for expenses incurred by Defendants after the termination of Plaintiff's employment;

(e)   interest, attorneys' fees and costs incurred by Plaintiff in the prosecution of this claim; and

(f)   any other relief this Court deems appropriate.

## <u>COUNT VII</u>:
## ACCOUNTING
### (as to the Company)

142.   Plaintiff re-alleges and incorporates by reference all the previous and subsequent assertions as though fully set forth herein.

143.   A member of an LLC "may have a formal accounting of the limited liability company's affairs, as provided in an operating agreement or whenever circumstances render it just and reasonable." MCL 450.4503(5)

144.   Section 3.8 of the Original OA requires (i) the Company to keep all tax returns and the books of record of the Company at the Company's principal place of business for inspection by the Members or their duly authorized representatives, and (ii) the Tax Matters Member to distribute to each of the Members, as soon as practicable after the end of each Fiscal Year, information with respect to the Company necessary for each Member to prepare its federal, state and local tax returns.

47

145.    Due to the unlawful divestment of his membership interest, Eklund does not have access to the financial information and books and records of the Company.

146.    In view of all the allegations set forth in this Complaint, an accounting is justified in this matter and should be ordered as to the Company.

147.    An accounting is necessary to determine (i) the amounts Defendants unlawfully withheld from Eklund, (ii) any diminution of or increase in the value of the Company, (iii) the fair value of Eklund's membership interest, and (iv) any material modifications of the operations and status of the Company since Ross and Caramanoff divested Eklund of his membership interest.

Wherefore, Plaintiff seeks entry of a judgment in his favor and against the Company awarding the following relief:

(a)    the Company's production of (i) its federal and state tax returns for 2023, and any other filings the Company has submitted or is required to submit to any federal or state or other governmental authority in 2023 and 2024; (ii) its current Operating Agreement, as amended; (iii) a current list of the full name and last known address of each Member and Manager; (iv) any valuations or appraisals of the Company's assets or equity; and (v) all sales forecasts prepared by the company or any third party; and (vi) all other books and records of the Company kept at

the principal place of business of the Company; and

(b)     a formal accounting of the Company's affairs in 2023 and 2024.

**COUNT VIII:**
**IMPOSITION OF CONSTRUCTIVE TRUST**
**(as to all Defendants)**

148.   Plaintiff re-alleges and incorporates by reference all the previous and subsequent assertions as though fully set forth herein.

149.   Ross and Caramanoff are operating and continue to operate the Company in such a way that exploits the assets of the Company and affects the membership interest misappropriated from Eklund, and Ross and Caramanoff are receiving substantial amounts of money from such exploitation and membership interest.

150.   Under the terms of the parties' agreements, including the OA, SRA, EA, and/or their longstanding policies or practices, Plaintiff has been wrongfully deprived of the benefits derived from such exploitation of the assets and this membership interest and distributions, among other things.

151.   The distributions, Company assets, and Company equity are all appropriately Plaintiff's property to the extent of one-third of their collective value, and Ross and Caramanoff should be deemed as acting as the constructive trustees of the distributions, Company assets, and Company equity that would otherwise belong to Plaintiff but for the wrongful conduct complained of herein.

152.   A constructive trust is appropriate under these circumstances to provide equitable protection to all of Plaintiff's property  obtained by Ross and Caramanoff through misrepresentation, breach of fiduciary duties, and similar equitable considerations that make it improper for Defendants to retain title to or possession of Plaintiff's property.

153.   Even if Ross and Caramanoff did not wrongfully obtain Plaintiff's property, a constructive trust is appropriate here based upon their improper refusal to return the property.

154.   This Court has the equitable authority to shape a constructive trust as needed to preserve and protect the Plaintiff's property.

Wherefore, Plaintiff seeks entry of a judgment in his favor and against all Defendants, jointly and severally, awarding the following relief:

(a)    imposition of a constructive trust over (i) a 33.3333% membership interest in the Company encompassing all the management, economic, voting, and other rights enjoyed by Ross and Caramanoff, and (ii) an amount equal to the aggregate of the distributions, compensation, and other payments received by Ross and Caramanoff from the Company on and after June 6, 2023;

(b)     interest, attorneys' fees and costs incurred by Plaintiff in the prosecution of this claim; and

4857-1500-2055, v. 1

(c)     any other relief this Court deems appropriate.

Respectfully submitted,

HERTZ SCHRAM PC

/s/ Walter J. Piszczatowski
Steve J. Weiss (P32174)
Walter J. Piszczatowski (P27158)
Attorneys for Plaintiff
1760 S. Telegraph Rd., Ste. 300
Bloomfield Hills, MI 48302
(248) 335-5000 / Fax: (248) 335-3346
sweiss@hertzschram.com
wallyp@hertzschram.com

Dated: June 12, 2024

51

## DEMAND FOR JURY TRIAL

Plaintiff, Richard Eklund, by and through his attorneys, Hertz Schram PC, hereby demands a trial by jury for those claims that may be so tried.

Respectfully submitted,

HERTZ SCHRAM PC

_____
Steve J. Weiss (P32174)
Walter J. Piszczatowski (P27158)
Attorneys for Plaintiff
1760 S. Telegraph Rd., Ste. 300
Bloomfield Hills, MI 48302
(248) 335-5000 / Fax: (248) 335-3346
sweiss@hertzschram.com
wallyp@hertzschram.com

Dated: June __, 2024

4857-1500-2055, v. 1